All right, welcome to Day 3 of the West Court panel. We have a full docket this morning, so we won't tarry. We'll call the first case up, U.S.A. v. Kelly-Tuorila, who's Mr. Rivera. May it please the Court. Good morning, Your Honors. I am CJA-appointed attorney for Appellant Kelly-Tuorila, and I appreciate the opportunity to present her case this morning. Your Honors, this case involves health care fraud and the use of false statements to process Medicare reimbursements, but I think context really matters in terms of the charges against Ms. Kelly-Tuorila. Kelly-Tuorila worked for a company known as DTS. It was a small, relatively unsophisticated company operating out of an office in Devine, Texas, near San Antonio, and essentially the operation was started by a man named Dan Smith. Mr. Smith was the guy, the buck stopped with him, so to speak. Mr. Smith hired and trained folks that were known as recruiters, so these are the folks that would go out into the community, would go to the mall, would go to restaurants and find folks that looked like perhaps they needed durable medical equipment, because that's what DTS was in the business of, providing durable medical equipment, things like scooters, wheelchairs, power wheelchairs. And so folks like Robin Hagler, who was also indicted and prosecuted in this case, would go out into the community and find those people, gather up the information to process a claim and send it into the office, and that's where Kelly-Tuorila worked as the biller at the office. I think in terms of context, a couple things are important. Number one, Mr. Smith, again, was the owner and had control of DTS. He is where the buck stopped. And number two, he trained those recruiters. And the record shows that Ms. Hagler was the one going out into the community. She's the one gathering information on doctor's prescriptions, doctor's information, and she is the one who told those folks that she made contact with, I can get you durable medical equipment, and if you don't have the right doctor's information, I assure you I can still get it. And all that comes to a head when you look at the testimony of the government's kind of star witness, their complaining witness at the trial, a woman by the name of Michelle Cleveland. An unfortunate turn of events for Robin Hagler. She goes to a restaurant, approaches the Clevelands. Mr. Cleveland appeared that he might need some sort of piece of equipment. She gives her speech to him, hey, I think I can get you a piece of equipment, including if you don't have the right doctor's information. Unfortunately, Michelle Cleveland had worked in the billing world for about 20 years, and she knew that's probably inappropriate. You shouldn't be making that promise. I'm going to contact the authorities. And so our case begins. At trial, though, Ms. Cleveland said that it would be absolutely appropriate for a biller, such as herself, such as Kelly Terilla, to rely on good faith on the information being submitted to her by way of a recruiter out in the field, the person who actually makes face-to-face contact with a potential client. And so what you have is a scenario where the record evidence is folks like Robin Hagler are the ones that are sitting down talking to face-to-face with a potential client saying, give me that doctor's information, give me who your doctor is, give me the stuff that I need to see if you have that prescription that would justify ordering the equipment and then submitting a reimbursement. And the testimony was also that if Robin Hagler couldn't get that information, number one, she assured the end client that, hey, I'll still get it for you anyway. And number two, if she ran into problems, she turned to Dan Smith, not Kelly Terilla. And so the real question here, similar to some other recent cases out of this court, I think particularly the Ganji case, is what is the thing that Kelly Terilla did that an innocent person would not do? Because I think it's also important to note that there were other recruiters. Robin Hagler focused her efforts in the Waco area, and that's really where the allegedly fraudulent activity occurred. DTS is located three hours away near San Antonio. DTS had other recruiters. The testimony was that, for example, Norma Perez was focusing her efforts as a recruiter in the San Antonio area. And she was processing or submitting legitimate claims to DTS. And so where's the distinction? And there was no evidence that there was a distinction. Miss Kelly Terilla receives a report, the forms from Hagler as opposed to Perez. What is she doing differently in processing that and looking at the form and saying, okay, this is the information that was provided to me by the recruiter. I'm going to send off an order form for my equipment. I'm going to submit it off to Medicare to get reimbursed. That was different when she was presented with a claim from Hagler as opposed to a claim from Perez. And I think really that's the crux of our case, Your Honors, is that this is a case that the government did not prove the mens rea element of any of the counts. What should we do with her confession? I think you should do the same thing that, frankly, the government did, not put much weight on it. I mean, as I said in my brief, to me, if you had a confession that was a strong confession, you put it up on the Elmo, you put it in a presentation, you beat the defendant about the head and shoulders with that confession in some way. That's not what the government did. The government had several hundred pages of documentary evidence, five days of testimony, and it's just kind of buried. Oh, she also confessed. And I think, as I said out in my briefing, Your Honors, if you look at that, I don't know that it's a confession. I truly don't believe it's a confession. If you look at it, that is a hindsight statement. I mean, think of the context of how that confession happened. DTS is under investigation. The law enforcement is at your door, and they come to you and say, You willing to talk with us and potentially cooperate and avoid some of the consequences that you might otherwise face? And she provides a statement and says, Basically, in hindsight, I should have been more vigilant. Well, that's a pretty reasonable statement. That is not to say that at the time that she was presented with any one of these claims, she knew this information is bogus and I'm going to send it off to Medicare anyway. And that's what I would say, is if you read that confession closely, that is someone who has been asked by a law enforcement officer. Look, we are investigating this, and it turns out a lot of these claims, at least in the government's opinion, were not valid. What do you have to say about that? Well, as the person who submitted those claims, sure, she's going to say I should. And I think that's the word she used. I should have been more vigilant, but not that I knew at the time. And that's what's required to support to support a conviction on any of the counts in this case. Essentially, it's this, Your Honor. I mean, you have four different counts. You have 21 counts. Four of them are four different types of offenses, aiding and abetting in health care fraud, conspiracy to commit health care fraud, false statements, aiding and abetting in false statements of health care fraud, and aggravated identity theft, aiding and abetting in aggravated identity theft, because the claim is that doctor's refused without their permission. And I think each one of those requires, well, they absolutely require, a proof of an appropriate mens rea. Each one of those has an intent element that either requires that the defendant intentionally join in the criminal activity or knowingly join in the criminal activity. And, of course, for all of the aiding and abetting offenses, not only that, they have to do something that furthers, that not only joins in the principal's activity, but seeks to further it. Now, I think the language out of Ganji on that point is especially important, which is you have to show, you don't lightly infer a criminal agreement or joining into a criminal enterprise by a conspiracy or aiding and abetting. You have to show the person did something that they would not have otherwise done, something that is not otherwise innocent conduct. So I think the government took the position at the time that, you know, there were a number of cases that were essentially, you know, Kelly Terilla, the forms that left your office had coding on them that reflected equipment that was either not actually provided or was inaccurate, or that included doctor's information that was not accurate. Because the testimony was essentially this, a handful of doctors or their custodians of records or both testified that, yeah, we didn't issue that prescription. Or a handful of inpatients said, I didn't get that scooter or I got something different. None identified ever meeting, working with, being contacted by Kelly Terilla. And so the implication was essentially this, well, that paperwork passed through you, you received it and then submitted it, and so you must have been in on it. But I think it's one thing to say that if there was some proof that she knew the information was false. She was billing for electric wheelchairs, I think, when what they were delivering was scooters. And she knew that. I mean, the person who's doing the billing would know that. That's certainly evidence that she knew that something bad was going on. Well, Your Honor, first I clarify that that is 8 of the 21 counts. And so that would potentially, you know, your conspiracy, your aggravated identity theft, those would still not be supported by that evidence. And then secondly, I would say that the fact that scooters were delivered when wheelchairs were billed for is not intent. It does not show her knowledge. Things get misdelivered all the time. Amazon doesn't have a 100% track record of getting me the thing that I actually ordered. The evidence at trial was that hundreds, potentially thousands of claims were made, were processed through DTS. And the government can find 8 where the delivery was not the right piece of equipment. And I think, again, the context of what this is matters. This is not some sophisticated operation that had an inventory tracking system that said, well, I placed an order for this and I'm supposed to send this specific piece of equipment off. If you look at the evidence, the exhibits on the inventory tracking are literally a Word document where you would go up in the left corner and click insert table and just hand fill in the orders. And so to say that she got a few wrong over the almost 5 years and hundreds of claims, I don't think necessarily says that she had criminal intent. And I think also that's kind of one of the lessons of Gandhi is when the government takes the position that you are such a mastermind that you can manipulate the Medicare system and kind of lead people into doing that along with you, it can't also take the position that you're that careless, that reckless, that foolish. And sometimes the innocent and simpler answer is the answer. And I think that's true in this case. This is not an operation where, for example, you have screens that are popping up and saying, well, this order was placed, fill that shipment. I think when you put it in the context of this little shack in Devine, Texas, with one computer outlet and handwritten tracking that a few orders out of hundreds were wrong does not show criminal intent. So, Your Honors, I think it boils down to this. Beyond those counts and beyond that theory of, well, a few of the orders were wrong, the counts were supported by the doctor's information on forms that were submitted for reimbursement were also wrong in that the prescription supported a power wheelchair instead of a scooter. And to do that, it indicated that the doctor had prescribed the power wheelchair and in support of that, the doctor's name or NPI number was used. But again, the evidence was that it was Robin Hagler going out and gathering doctor's information. And so there's no connection between where that information came from and Ms. Tarilla being the source of that information. By all accounts in the record and at trial, Robin Hagler would have submitted that information on a form. Robin Hagler even kind of created her own form to go out into the field and gather up information and included a space for the doctor's information. So the most logical inference to draw here is that Robin Hagler gathered that information and when she couldn't get sufficient information consistent with the testimony at trial, she fabricated it or found some way to get it that wasn't legitimate and then sent it off to Kelly Tarilla, who in good faith relied on it. And again, according to the government's own complaining witness, that would be absolutely appropriate under the circumstances. And so, Your Honors, I think that's really the basis of our case. I think what the government has, the government's basic theory is that she was negligent, she was foolish. How could she be in the midst of all of these claims that were fraudulent and not known? Well, I thought there was evidence that she ordered power scooters when the claims were for wheelchairs and that sometimes she ordered power scooters before there was documentation for the power chairs. So, on the first part of your question, Your Honor, that's true. There were times when she ordered some lesser form of equipment like a power scooter even though, I'm sorry, ordered a lesser form of equipment like a power scooter, less expensive, even though the Medicare documentation was it's for a power wheelchair, more expensive. But that goes to my response to Judge King a moment ago, which is sometimes that's going to happen. And I think if you look, I'm out of time. Can I finish my answer? Yeah, finish your answer. So, on the first part of your question, though, that's right. But my answer to Judge King a moment ago would essentially be my answer to that, which yes, sometimes she did submit an order that did not match up with the ultimate reimbursement. But you're talking about hundreds, thousands of claims over the course of almost five years. You're saying mistakes happen. Of course mistakes happen. And the other thing is this. Not only is the inventory system relatively unsophisticated, if you look at the order forms, they're separated by days if not weeks. And so for there to be some mix-up between what's ordered and what's submitted to Medicare, sure, I think there's absolutely mistakes happening. And again, my basic point is this. It's the government's burden of proof to show beyond reasonable doubt that mistakes don't happen, that it wasn't a mistake, that it wasn't a handful mixed in with hundreds of claims. All right. Well, I'll stop you there. You, I think, responded. And you've certainly reserved your rebuttal time to come back up. Thank you, Your Honor. Thank you. All right. Mr. Richter. May it please the Court. Zachary Richter for the United States. The defendant confessed that she knew she was submitting fraudulent claims at the time she submitted them. Her confessions were sufficient to support the jury's findings of knowledge and intent. Now, during the opening presentation, we only discussed the written confession that Ms. Kelly Torella provided to the FBI, but there's also reflected in the record at page 1444 an oral confession to an FBI special agent where she made clear that she knew at the time she was submitting the claims that those claims were fraudulent. In addition, for her written confession, she stated, I knew approximately 1,000 claims to be fraudulent. Construed in the light most favorable to the verdict, that is plainly sufficient to support the jury's findings in this case. Both the written statement and the oral statement were presented to the jury at trial and emphasized to the jury at trial. Was there any explanation from anyone about the 1,000 claims, what she knew was fraudulent about them? An FBI special agent testified that he asked her before she wrote out her written confession how many of these claims were fraudulent, and she said all of them were fraudulent. And when you look at this, this is not a matter of a few scattered mistakes. We're talking about someone who was the sole biller for this business and billed over 700 power wheelchairs and zero power scooters, yet as her counsel just pointed out, she was ordering power scooters at the same time, many of them. And she was also the person who was not only making the list, scooter, scooter, scooter, going off to Medicare beneficiaries that she is billing on behalf of when she's billing Medicare. She's billing for the more expensive power wheelchair, but then she's providing the power scooter not a few times, but many, many times. And as this Court stated in Megwa, no one makes that many mistakes without meaning to. How many mistakes were there? He says eight, you say 700. Oh, well, she billed 800 times for power wheelchairs, and her confessions reflect a thousand fraudulent claims. So there may have been more fraudulent claims in there that weren't directed necessarily at Medicare or Medicaid. But there were also other aspects to this fraud which would have been abundantly clear to Ms. Kelly-Turrilla. She billed around 700 to 800 times for elevated leg rests that can only go on power wheelchairs. And she only ordered about 150 of those actual leg rests. So she was billing many, many hundreds of times for equipment that she hadn't ordered nearly that many times. On top of that, as Judge Owen observed in her question, in many cases she said that the equipment was provided weeks before the equipment had even left the supplier's stockroom in another state. So they could not have been provided at that time. Was there an argument or was part of the government's case, not saying it should have been, but a showing of how she would have benefited from, you know, this? In other words, I'm not suggesting it was an element of it, but was there some evidence or some showing that not only did she do it, but somehow she derived a benefit directly or indirectly from it? Or, as I guess she's urging, you know, I just had a job and I just did this and so forth. I don't know. Yes, Your Honor. And you're right to point out that it's not an element we have to show. However, we did show that. The bank records were traced, showing the flow of the Medicare funds into several bank accounts associated with members of this conspiracy. Ms. Kelly-Turrilla received about $160,000, and then she passed along about $30,000 of that. That's over the course of approximately 18 months. So over 18 months, she's getting about $130,000. That's consistent with the same amount that was in the Delgado case, which is cited in our brief. And it's also many tens of thousands of dollars more than any version of her claimed salary. At some points, for instance, in the job application she submitted later, she said her salary was about $38,000. At some point, she said it was about $4,000 a month, so $48,000 a year. On any account of what her salary was, she was receiving tens of thousands of dollars more than that. And not only that, she was taking the money from one of her co-conspirators and transferring it to other members of DTS, which shows that she's really one of the nerve centers of this operation. She's not only the sole biller, she's not only involved in hiring, but she's also the person who's doing the ordering and handing off these delivery lists. And when you look at that role in the operation, it's comparable to the role in operations like Grant or Willett, where this court has found the evidence sufficient for a jury to infer knowledge and intent in a health care fraud conspiracy. What other, or we have the confession, but what corroboration of the confession, such as perhaps what you just said, was there other corroboration, or was there a testifying witness, one of those who pled guilty, that added evidence for a jury to consider about this defendant's case? I'm not really sure, so I guess my question is, tick off for me what the corroborating evidence was in support of, you know, just the confession. Perhaps what you just said about the money, I take it that's one element, one aspect, right? That's right, Your Honor. So the confession, all the circumstantial evidence I just mentioned, where you know that she's billing for items that she couldn't possibly believe that this organization was providing, the wheelchair, scooter swap, the leg rest, the false dates. There's also the altered prescription form that's in the record and was presented to the jury. There was a prescription that was provided by a doctor's office. The doctor's office, the records keeper for the doctor's office testified that that was sent to the office where Ms. Kelly Chirillo was working. This is hardly a huge office. There's two or three people. She's the only person who's really doing the billing there. So the fax arrives at that office. It is then altered. It is then admittedly signed by Ms. Kelly Chirillo and sent off to Medicaid in support of a claim. And what the swap was, was the doctor had prescribed a manual wheelchair that was whited out on the prescription, and then it was faxed with Ms. Kelly Chirillo's signature to Medicaid, claiming a power wheelchair and multiple devices related to the use of a power wheelchair. So all of those things combined, as well, just to tick off more of the evidence here, Ms. Kelly Chirillo signed a guarantee when she helped get DTS, this company, started, saying that she would guarantee any debt on the power wheelchairs and power scooters that this company ordered. When Medicare came back to this company and said, we need you to provide proof that these prescriptions exist, instead of providing that proof, Ms. Kelly Chirillo walked away from $50,000 worth of claims instead of providing the underlying documentation. So all of those things put together would, I think, certainly substantiate the jury's findings when you look at it, especially when you look at it in the light most favorable to the verdict. Briefly on the Ganji case, of course in Ganji there was no confession, and that's a clear distinction between the two cases. Also in Ganji there were two separate practices, geographically separate practices, and the defendants in Ganji had no way of knowing that a separate practice elsewhere was operating fraudulently. But in this case, Ms. Kelly Chirillo is again the nerve center of this fraud. All of the claims are coming to her and she's sending off all the claims through billing to Medicare and Medicaid. And every one of those claims to Medicare and Medicaid, she indicated that there was voluminous supporting documentation. So every doctor that testified said that if you want to get a power wheelchair, you need voluminous supporting documentation for that prescription. And so there should have been many, many, many pages of supporting documentation, yet there was none of that ever found, and the amount that there were some documents burned, there weren't enough documents burned to potentially substantiate that. So we're talking about someone who has never shown that she operated in good faith. There's no sign here and there was no presentation by the defense. There was no evidence provided by the defense that she ever relied on any piece of paper or any fraudulent prescription in good faith. And in fact, there's actually no evidence in the record of any legitimate claim. If you look at the record citations provided by the appellant in her briefing, pages 1231 and 32, that was somebody testifying that they tried to find legitimate recipients. And if you look at page 1236, the other citation that's repeatedly used, that was a testimony by one of the recruiters that she never submitted things on behalf of fake patients. The nature of this fraud was not fake patients. These were real people. They just didn't have prescriptions for these kinds of services, for these kinds of devices, and when they did have, when they did ask for these kinds of devices, they were wheelchairs and not provided with the elevated leg lifts and so forth. So we're not talking about a handful or just a few things or instances where mistakes happen. We're talking about a repeated, systemic, systematic fraud that happens tens, hundreds of times. And if there are no further questions, I'll yield back the remainder of my time to the court. All right. Thank you, sir. Rebuttal, Mr. Rivera? May it please the court. Just a handful of things I'd like to address. Number one, maybe it was relevant conduct that there were 700 to 1,000 false claims ultimately at sentencing. The government chose to advance eight counts based on the provision of a scooter as opposed to a wheelchair, and that's the way this case went to trial. And so the idea that somehow that supports a conviction now, that's not what the jury heard. It was these eight counts, these eight scooters versus wheelchairs, power wheelchairs. Your Honor, Judge Stewart asked about the benefit, and that's, you know, obviously that's something that was considered in the Ganji case. Why would this person be motivated to be part of a criminal enterprise? And the response was, well, she garnered $130,000. I would add to that, she worked for DTS for almost five years. I thought he said that was over an 18-month period. But there was no evidence that she garnered any benefit above and beyond that. And so the government's evidence at trial was that for five years of services she received... Well, I'm sorry. I thought that the dollars was confined to an 18-month period. No, I agree, Your Honor. It's unlikely that she would work for three and a half years for nothing. Perhaps, but as the defense, that's not for me to go disprove. A reasonable inference could be drawn that she was paid $130,000 for that 18-month period. Perhaps. But my point is that's not outlandish. That's not outlandish for someone who the government says helped a $4.8 million company and was their nerve center to make as a legitimate builder. There's no evidence in here at all that she had a salary from this outfit. I believe, I don't believe there was any testimony about the salary at a trial. And so the only evidence that we have is that these transfers, which I assume were functionally her salary, because that's the only payment that was demonstrated. I thought she represented to other people that her salary was in the $38,000 range. I think that's accurate, Your Honor. I think that she did say at various times it was somewhere in the $3,000 to $4,000 range. But my point would just be that if the government analyzed her bank account and its proof didn't show anything above and beyond or in addition to these transfers, then that's the remuneration she received. I think the other thing is this, the discussion about the altered form. My question would be, how does that matter? Again, the evidence is that these forms are coming in from Robin Hagler. And so there's some distinction with the dates or the addition of the prescription. Did Robin Hagler add that or did Kelly Terilla add that? Because that's no different than any of the other examples where we concur, we agree. Kelly Terilla at some point signed off and said, yep, this is the prescription. I hereby send it off to Medicare. I thought it was whited out after it had been faxed. She at least should have known it was fraudulent and didn't do it herself. That's true. It may have been whited out. But does that mean that she's supposed to know that it's fraudulent? That perhaps the doctor made a mistake and whited it out? Or that Hagler doctored it up? And the other thing is this, to say that she had some criminal intent because there's not documents supporting the things that she did laying around. Dan Smith burned everything when he found out about this. And so to kind of prove a negative here is what the government wants Kelly Terilla to do. Go show us the documents that would support all your claims. Well, the guy who everyone says was the ultimate decision maker, who was the fixer when Hagler ran into problems out in the field, when he caught wind of this prosecution, this investigation, he burned everything. And so she can't go show you what the forms were and what her support was. And so these issues about what was actually presented to her versus what she sent out, I'd be glad to try to dig that up, but that's just not available to her. And so it was the government's burden to prove it through other circumstantial evidence. And ultimately, the very clean and simple truth of this is that Robin Hagler operated and said to folks, I will get you a power piece of durable equipment regardless of your doctor's prescription. And she was the one sending information to Kelly Terilla. And what she knew is just not clear in terms of what she personally falsified. And I just don't think that the government met that burden. And that's all I have, Your Honor, so I appreciate it. All right. Were you counsel appointed on appeal only or did you handle the trial? I did not handle the trial. Okay. All right. Well, the court really, really, really, really appreciates our CJA counsel and you are very representative of the extremely high quality of representation provided in the case. Nobody would know that you didn't try the case below. So you're very well prepared and you're briefing an argument to us and we really do appreciate lawyers such as yourself who take the cases and who brief them and represent their clients well. I wanted to say that to you on behalf of the court and for all the CJA counsel that we get. I very much appreciate it. All right. Thank you. And thank you, Mr. Richter, for . . .